In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-2666

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JULIO CESAR SANCHEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 756—**John W. Darrah**, *Judge.*

ARGUED MARCH 30, 2010—DECIDED APRIL 28, 2010

Before POSNER, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Julio Cesar Sanchez, an El Salvadoran citizen and national, was removed from the United States to Mexico in September 2006. Six months later, in March 2007, Sanchez presented invalid permanent resident documents and successfully gained entry into the United States at the same port from which he was deported, Laredo, Texas. The record lacks any indication of what prompted Sanchez to return when he

did, and it is also unclear whether Sanchez remained in Mexico from September to March or if he made it home to El Salvador before returning. (He claimed he asked for permission to reenter the United States at the U.S. Embassy in San Salvador, but the government has no record of any such request.) In any event, by April 2007 Sanchez was in Chicago, where the police caught him participating in a drug deal. He was arrested, pleaded guilty to delivery of a controlled substance, and received three years' probation and a $1600 fine.

While Sanchez was in the custody of Cook County authorities pending the resolution of his drug delivery charge, an immigration agent interviewed him and learned that he was an illegal alien who had previously been removed from the United States. The agent lodged a detainer against him, and a grand jury indicted him for illegal reentry in violation of 8 U.S.C. § 1326(a) & (b)(2). Sanchez proceeded to trial on the charge in 2008. At trial, the government called as a witness Douglas Standerfer, the immigration agent who had interviewed Sanchez. Standerfer testified that Sanchez was a native and citizen of El Salvador who had been ordered removed to El Salvador but in fact had been mistakenly removed to Mexico. During that removal, Standerfer testified, Sanchez had been given—and placed his finger-print on—a Form I-294 notifying him that he could not return to the United States without the express con-sent of the Attorney General. The Form I-294 bearing Sanchez's fingerprint was entered into evidence without objection, as were several other documents from Sanchez's alien registration file, including the

"Record of Sworn Statement" memorializing his interview with Standerfer.

On cross-examination of Standerfer, Sanchez's counsel started asking questions about the mistaken removal to Mexico. The district court requested a sidebar, at which it questioned the legal significance of that fact. Sanchez's defense team explained that they wanted to argue to the jury that because Sanchez had been taken to the wrong country, he had never been "removed" for purposes of 8 U.S.C. § 1326 and therefore could not be guilty of illegal reentry. They also proposed a jury instruction relating to this theory. The district court expressed surprise at this previously unarticulated theory of defense and admonished Sanchez's counsel for not bringing the theory to its attention earlier. *See* Tr. 99-101, May 7, 2008. After counsel explained that prior to hearing Standerfer testify they were unaware that the removal to Mexico rather than El Salvador was due to an error in Sanchez's file, *id.* at 92, the district court temporarily excused the jury and convened a hearing to determine whether Sanchez's theory and instruction could be presented to the jury.

At the hearing, Sanchez's counsel offered three pieces of authority to support their theory: *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005), which held that aliens may be ordered deported to countries that have not indicated in advance a willingness to accept them; 8 U.S.C. § 1231(b)(2), which was parsed in *Jama* and provides a framework for determining to which country an alien should be removed; and 8 U.S.C.

§ 1101(g), which provides that an alien who leaves on his own steam while a removal order is pending is presumed to have been deported lawfully. The district court heard the defense team's arguments about the pertinence of these authorities, reviewed them itself, and concluded:

> There is nothing in this case that supports [Sanchez's] assertion. There is nothing in the plain reading of the statute itself in any of those sections cited by the defense that would suggest that Congress intended that someone removed from the United States pursuant to an order of deportation, albeit to the wrong country, could physically reenter the country with impunity from prosecution.

Tr. 120-21, May 7, 2008. The district court also denied Sanchez's proposed jury instruction. "It's not relevant," the district court ultimately said of the theory at the end of the impromptu hearing. "You may not argue it." *Id.* at 123.

The jury returned and heard testimony from a finger-print examiner. Sanchez's counsel did not cross-examine that witness, the only other witness to testify for the government, and no witnesses were presented on Sanchez's behalf. At closing argument, Sanchez's counsel asserted that a language barrier between Sanchez and Standerfer provided a basis for the jury to doubt the reliability of what Standerfer said he learned from Sanchez during his interview. The jury deliberated for less than two hours and returned a guilty verdict. Sanchez was later sentenced to seventy-seven months in prison and three years of supervised release.

Sanchez's sole argument on appeal is that the district court abused its discretion by preventing him from arguing during closing that he was never properly removed from the United States because he was sent to the wrong country. (He does not attempt to argue that the jury instruction was improperly denied, a determination we would have reviewed de novo. *United States v. Canady*, 578 F.3d 665, 672 (7th Cir. 2009)). He no longer seeks to rely on *Jama* and 8 U.S.C. §§ 1101(g) & 1231(b)(2), a wise move as none of those largely irrelevant authorities would have helped him any more here than they did at the district court, and now simply contends that his erroneous removal to Mexico was a "significant issue" that the jury should have been able to consider. We suspect he characterizes it as such because "exercising tight control over [closing] argument is undesirable when it precludes counsel from raising a significant issue*." United States v. White*, 472 F.3d 458, 463 (7th Cir. 2006) (quoting *United States v. Mahone*, 537 F.2d 922, 928 (7th Cir. 1976)). This is an exception to the general rule affording district courts great latitude in limiting closing argument over "time consuming peripheral issues in the interests of judicial economy and reducing juror confusion." *Id.* at 462 (quoting *Mahone*, 537 F.2d at 928); *see also Herring v. New York*, 422 U.S. 853, 862 (1975) ("The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray

unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects he must have broad discretion.").

We disagree with Sanchez that his mistaken removal to Mexico represented a "significant issue." As the district court correctly determined at the hearing held during trial, the location to which Sanchez was removed is irrelevant to the ultimate determination of whether he violated 8 U.S.C. § 1326(a). (Subsection (b)(2) just enhances the penalty for aliens who have committed aggravated felonies and is immaterial to the violation of subsection (a). *See Almendarez-Torres v. United States*, 523 U.S. 224, 235 (1998).) For a defendant to be guilty of illegal reentry under 8 U.S.C. § 1326(a), the government need only prove four things: (1) that the defendant is not a citizen of the United States; (2) that the defendant was removed from the United States or left while a removal order was pending; (3) that the defendant was found in the United States after his removal; and (4) that the defendant did not have the consent of the Secretary of Homeland Security to return. *See* 8 U.S.C. § 1326(a); *United States v. Villarreal-Tamayo*, 467 F.3d 630, 631 (7th Cir. 2006); Tr. 152, May 7, 2008.

Section § 1326 does not require that defendants be removed in a certain way (e.g., by plane, train, or automobile) or to a certain place for removal to have taken place for its purposes. In both legal and lay parlance, removal simply means "[t]he transfer or moving of a person or thing from one location, position, or residence to another." Black's Law Dictionary 1409 (9th ed. 2009);

*see also* Webster's Third New International Dictionary 1921 (1976). Under this commonsense, plain meaning definition, Sanchez was "removed" from the United States when he was physically taken to Mexico. And under our immigration laws, even aliens who elect to leave the United States to go any place before their removal orders have been fully implemented are "considered to have been deported or removed in pursuance of law." 8 U.S.C. § 1101(g); *see United States v. Ramirez-Carcamo*, 559 F.3d 384, 387-89 (5th Cir.), *cert. denied*, 129 S. Ct. 2849 (June 22, 2009) (No. 08-10530). If an alien is considered "removed" for purposes of § 1326 when he leaves on his own volition in the face of pending immigration proceedings, so too should he be considered removed when he is escorted out by the authorities pursuant to what he concedes was a valid deportation order.

Sanchez's circumstances are similar to those in *United States ex rel. Bartsch v. Watkins*, 175 F.2d 245 (2d Cir. 1949), in which a seaman born in Danzig was deported to Bremen, Germany, rather than the "Free City" of Danzig and was apprehended when he tried to reenter the United States. There, as here, the principal contention on appeal was that the seaman's return to the United States was not an "entry" because he was deported to the wrong place. The Second Circuit determined that it was "unnecessary" to assess the validity of the seaman's deportation, noting that "[e]ven if it were assumed that it was wrong to deport him to Bremen, Germany, he had no right to reenter the United States without compliance with our immigration laws." *Watkins*,

175 F.2d at 247. What was true then remains true today, particularly where the defendant concedes his illegal presence. Record of Sworn Statement, Appellee Br. App. 4 ("I know that I committed a crime and that I reentered the United States but I would like you to forgive me.").

Of course, this is not to say that all means of effectuating removal are proper, or that there exists no set of facts under which an alien could legitimately reenter the United States after being escorted out. For instance, if the government decided to remove an illegal alien by sailing her out to the boundary of the territorial waters of the United States and tossing her overboard, and she happened to float back into United States waters, she would have a strong necessity defense available. Here, no evidence of any remotely analogous exceptional circumstance or situation was presented. Sanchez didn't present any evidence that he objected to being placed in Mexico, nor that he was forced to come back to the United States. All we know is that Sanchez was escorted over the Mexican border in September 2006 and then came back across that same border in March 2007. Without more evidence, we cannot conclude that the fact that Sanchez was erroneously sent to Mexico rendered his removal invalid, nor can we conclude that his unauthorized return to the United States was warranted.

Moreover, not only was Sanchez's theory irrelevant to the jury's determination of whether he violated § 1326, but it also posed an inappropriate question for the jury to consider. "It is the basic premise of our legal system

that juries are the triers of fact only; it is for the judge, not the jury, to interpret the law." *White*, 472 F.3d at 463 (quoting *United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002)). Sanchez wanted to argue that the government was required to prove that he had been deported to his home country, El Salvador, to satisfy the removal element in § 1326(a). *What* the government must prove is a question of law for the court; *whether* the government has adequately proved what it needs to is a question of fact for the jury. The district court properly bifurcated these inquiries when it denied Sanchez's request to present his theory to the jury during closing argument. We find no error in the court's actions, let alone an abuse of discretion. We therefore AFFIRM.