[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12487

_____

ESTELA MABEL ARGUETA ROMERO,

Petitioner-Appellant,

*versus*

SECRETARY, U.S. DEPARTMENT OF HOMELAND
SECURITY,
DIRECTOR, U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT,
FIELD OFFICE DIRECTOR, MIAMI FIELD OFFICE, U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT,

Respondents-Appellees.

—————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:20-cv-00053-PGB-GJK

—————————————

Before JORDAN, NEWSOM, Circuit Judges, and BURKE,* District Judge.

NEWSOM, Circuit Judge:

In 1995, Estela Mabel Argueta Romero, an illegal alien, voluntarily left the United States just before an immigration court formally ordered her removed.[1]  Years later, she reentered the country—again illegally.  When she applied for a stay of deportation, the government enrolled her in a supervision program and, eventually, sought to remove her pursuant to the 1995 order.  Romero filed a petition for habeas corpus relief.  She argued that she had "self-executed" the 1995 order when she departed the country shortly before its issuance and, accordingly, that the order was no longer operative.  The district court denied relief, reasoning that Romero's pre-order departure didn't constitute valid self-execution and, therefore, that the 1995 order remained effective.

———————

* Honorable Liles C. Burke, United States District Judge for the Northern District of Alabama, sitting by designation.

[1] Throughout this opinion, we use variations of the terms "remove" and "deport" interchangeably.

Romero's appeal presents two issues.  First, as a threshold matter, did the conditions of Romero's supervision program render her "in custody" within the meaning of 28 U.S.C. § 2241, such that the district court had jurisdiction to consider her habeas petition?  Second, on the merits, did Romero validly self-execute the 1995 deportation order when, shortly before it was entered, she voluntarily left the United States?  Because we conclude that the district court had jurisdiction under § 2241 and that Romero did not validly self-execute—and thus was not deported under—the 1995 order, we affirm.

I

Estela Mabel Argueta Romero illegally immigrated from Guatemala to the United States in 1993 and, shortly thereafter, applied for asylum.  The federal government denied her application and initiated deportation proceedings.  In January 1995, an immigration court issued Romero a hearing notice by mail.  About a week later—but before the hearing—Romero voluntarily departed the country and returned to Guatemala.  Then, in April 1995, the immigration court held a hearing and ordered her deported *in absentia*.

A decade later, Romero again illegally immigrated to the United States and, in 2016, applied for a stay of deportation.  The federal government temporarily approved her application and enrolled her in a supervision program.  As part of that program, Romero (1) had to "appear in person . . . upon [the government's] each and every request," (2) couldn't travel outside Florida for

more than 48 hours without notifying the government, (3) had to apprise the government of any change of residence or employment, (4) agreed to participate in a more stringent supervision program "if directed to do so," and (5) accepted that she would be detained upon violation of any supervision condition. Romero renewed her stay of deportation annually and attended her supervision appointments.

In 2019, the government denied Romero's stay-of-deportation application and issued a "Plan of Action" requiring her to depart the United States by January 2020 pursuant to the removal order that had been issued against her in 1995. Because Romero had left the country before the 1995 order was issued, the government assumed that it had never been validly executed, remained effective, and didn't need to be reinstated.

Romero initiated this action prevent her deportation. She sought a writ of habeas corpus and declaratory and injunctive relief under 28 U.S.C. § 2241, arguing that the government's ongoing supervision and planned removal subjected her to unlawful "custody." In particular, she contended that the 1995 order was no longer operative because she had validly self-executed it by voluntarily departing the United States before its issuance. Without

20-12487                Opinion of the Court                5

reinstating that order, she argued, the government couldn't lawfully supervise or deport her.[2]

The district court denied Romero's petition, reasoning that Romero didn't validly self-execute the 1995 order because it came into existence only after she had left the United States. The court held that the government could lawfully subject Romero to pre-deportation supervision and removal pursuant to the 1995 order without seeking its reinstatement. Romero appealed.

Before us, Romero renews her contention that the 1995 deportation order is no longer effective because she validly self-executed it in 1995. The government disagrees and, in addition, challenges the district court's subject-matter jurisdiction, arguing that the court lacked authority over this case because Romero was not "in custody" within the meaning of § 2241. We begin by verifying the district court's jurisdiction and then turn to the merits of Romero's self-execution argument.[3]

---

[2] Romero also brought a claim under the Administrative Procedure Act, alleging that the government had failed to properly follow the reinstatement process for deportation orders under 8 C.F.R. § 241.8. In her reply brief, Romero explained that she brought the APA claim preemptively, in the event that the government sought to reinstate the 1995 order. Romero concedes that because the government has not attempted reinstatement, her APA claim never ripened. Accordingly, we don't address it.

[3] Our review of both issues is de novo. *See Santiago-Lugo v. Warden*, 785 F.3d 467, 471 (11th Cir. 2015).

## II

## A

A federal court may grant a writ of habeas corpus only to an individual who is "in custody." 28 U.S.C. § 2241(c). Whether a person is "in custody" within the meaning of § 2241 is a question of subject-matter jurisdiction. *See Howard v. Warden*, 776 F.3d 772, 775 (11th Cir. 2015).

In *Jones v. Cunningham*, the Supreme Court clarified that an individual needn't be in "actual, physical custody" to meet § 2241's "in custody" requirement. 371 U.S. 236, 239 (1963). In that case, an individual released on parole but confined "to a particular community, house, and job at the sufferance of his parole officer" was deemed to be "in custody" because he was subject to significant restraints on his personal liberty. *Id.* at 242. In particular, the Court emphasized that the petitioner couldn't "drive a car without permission," had to "report to his parole officer" periodically, had to allow "the officer to visit his home and job at any time," and generally had to "follow the officer's advice." *Id.* Moreover, the Court noted that he could be returned to prison immediately upon violation of any restriction. *Id.* The Court reasoned that these conditions "significantly restrain[ed the] petitioner's liberty to do those things which in this country free men are entitled to do." *Id.* at 243. "Such restraints," the Court held, were "enough to invoke the help of the Great Writ." *Id.*

Following *Jones*, we have held that § 2241's "in custody" requirement should be construed "very liberally" and that habeas petitioners "need only show that they are subject to a significant restraint on their liberty that is not shared by the general public." *Howard*, 776 F.3d at 775. Even more closely on point is a decision of our predecessor court, *United States ex rel. Marcello v. District Director of Immigration & Naturalization Service*, which concluded that an individual who, like Romero, was subject to a deportation order and pre-deportation supervision was "in custody" within the meaning of § 2241. 634 F.2d 964, 971 & n.11 (5th Cir. 1981). The petitioner in that case was required to report to a representative of the federal government on a quarterly basis and was forbidden from travelling outside his state of residence for more than 48 hours without notifying the government. *Id.* at 971 n.11.

The conditions of Romero's supervision are similarly restrictive. She must appear in person at the government's request, can't travel outside Florida for more than 48 hours without advance notice, must apprise the government of any change in residence or employment, and must participate in a more stringent supervision program "if directed to do so." If she violates any of these conditions, she may be detained. Moreover, she is subject to a "Plan of Action" requiring her to depart the country or be forcibly removed. It is clear to us that Romero must endure restraints that aren't "shared by the general public," *Howard*, 776 F.3d at 775, and those restraints are materially similar to the ones imposed on the petitioners in *Jones* and *Marcello*. Accordingly, we conclude that

Romero was "in custody" and that the district court thus had jurisdiction under § 2241 to consider her petition.

## B

The government separately argues that 8 U.S.C. § 1252 foreclosed the district court's jurisdiction. Under that provision, "judicial review of an order of removal" may be sought only through "a petition for review" in accordance with the Immigration and Nationality Act—not through a habeas petition. 8 U.S.C. § 1252(a)(5).

In *Madu v. U.S. Attorney General*, though, we explained that a challenge to the *existence* of a removal order is different from a claim seeking judicial review of such an order. 470 F.3d 1362, 1363 (11th Cir. 2006). Although the latter falls within § 1252(a)(5)'s bar, the former, we held, does not. *Id.* at 1366. In *Madu*, an immigration judge had issued a conditional order of deportation that would spring into effect if the alien who was its target didn't voluntarily leave the United States by a specified date. *Id.* at 1364. The alien voluntarily left as promised but later illegally reentered the country. *Id.* When the government initiated removal proceedings based on the conditional order of deportation, the alien argued—in a habeas petition—that the order never came into being because he had voluntarily departed. *Id.* at 1364–65. We held that § 1252(a)(5) didn't bar the alien's habeas petition because he was challenging the very existence of the removal order, not seeking review of its substance. *Id.* at 1367.

20-12487              Opinion of the Court                    9

Like the petitioner in *Madu*, Romero doesn't seek review of an existing removal order but, rather, disputes that an operative order exists in the first place. Romero contends that because she voluntarily departed the United States, she self-executed the 1995 order, leaving in place no effective order pursuant to which the government can now deport her. Although the order in *Madu* never came into existence, while the order here—on Romero's theory—came into and then passed out of existence, both petitioners make the same basic argument: An operative removal order does not exist. Under *Madu*, therefore, § 1252(a)(5) did not deprive the district court of jurisdiction.[4]

### III

Having dealt with jurisdictional objections, we turn to the crux of Romero's case, which is her contention that the 1995 removal order is no longer effective because she self-executed it by voluntarily departing the United States shortly before it issued. All

---

[4] The government also suggests that the Supreme Court's recent decision in *Department of Homeland Security v. Thuraissigiam*, 140 S. Ct. 1959 (2020), barred the district court from exercising jurisdiction. But that case involved an alien seeking "additional administrative review of his asylum claim" through a writ of habeas corpus. *Id.* at 1963. The Court held that because habeas "has traditionally been a means to secure *release* from unlawful detention," it can't be used as a means to secure additional process. *Id.* Here, Romero seeks release from her supervision conditions and planned deportation—precisely the type of relief that a writ of habeas corpus is meant to provide. *See Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he traditional function of the writ is to secure release from illegal custody.").

agree that the government can't rely on an already-executed re-moval order to deport an alien who has illegally reentered the country; rather, it must "reinstat[e] the prior order." 8 C.F.R. § 241.8(a). All likewise agree that the government hasn't reinstated the 1995 order. Accordingly, if Romero validly self-executed that order by voluntarily departing in 1995, the government must now seek its reinstatement as a prerequisite to her deportation. But if the 1995 order wasn't self-executed, the government can deport Romero pursuant to it even now. Romero's habeas petition there-fore turns on whether she validly self-executed—and thus was "de-ported" under—the 1995 order. For the reasons that follow, we hold that she did not—and thus was not.

## A

The governing statutory provision, which defines when an alien is considered "deported or removed" under the INA, is 8 U.S.C. § 1101(g). In pertinent part, it states that "any alien ordered deported or removed . . . who has left the United States, shall be considered to have been deported or removed in pursuance of law." If Romero's 1995 departure meets § 1101(g)'s conditions, then she was "deported or removed" under the 1995 order, and the government must reinstate that order to deport her again. If § 1101(g)'s conditions weren't met, the government may proceed with its current, reinstatement-free deportation plan.

Both Romero and the government insist that § 1101(g)'s lan-guage is clear—and yet they offer diametrically opposite interpre-tations of it. For her part, Romero argues that she undeniably

(1) was "ordered deported or removed" and (2) "left the United States"—and, accordingly, she says, "shall be considered to have been deported or removed" by the 1995 order. On Romero's view, § 1101(g)'s two conditions—the existence of a removal order and the alien's departure—operate independently of each other, and it doesn't matter that she left the country before the order was issued. The government argues, by contrast, that because Romero departed before she was ordered removed, § 1101(g)'s second condition—"le[aving] the United States"—never occurred in the relevant sense. On the government's reading, § 1101(g)'s two conditions are successive: For the alien to be considered "deported or removed," her departure must follow the issuance of the removal order. The question for us is whether, as the government contends, § 1101(g)'s conditions must occur in a particular sequence.

We begin our analysis, as always, with the statute's text—again, "any alien ordered deported or removed . . . who has left the United States, shall be considered to have been deported or removed in pursuance of law." Notably—and as it turns out problematically—§ 1101(g)'s language is cast entirely in the past tense. If the provision stated that "any alien ordered deported or removed . . . who *leaves* the United States, shall be considered to have been deported or removed," it might more obviously have been read to embody two successive conditions. But the all-past-tense formulation isn't so straightforward. As a matter of grammar and syntax, neither party's interpretation of the enacted text is self-evidently correct.

On Romero's reading, § 1101(g)'s structure mirrors (to use our own example) a provision stating that "anyone convicted of terrorist acts who has worked for a foreign government shall be imprisoned for a minimum term of 20 years." It would make little sense to understand that hypothetical statute to cover only those persons who were convicted of terrorist acts and *then* worked for a foreign government. So too, Romero would say, it makes little sense to read § 1101(g) to require the occurrence of the first condition—the entry of the removal order—necessarily to precede the second—the alien's departure. Thus, she insists, § 1101(g)'s conditions must be understood to operate independently of one another.

The government, by contrast, asks us to read § 1101(g) as we might (to use another of our own examples) a workplace policy stating that "anyone sick who has come into the office shall be suspended." It would make little sense to suspend someone who (1) is sick today and (2) came into the office last month. In the same way, the argument goes, it makes little sense to consider someone deported who was (1) ordered deported today and (2) left the country months ago. So, the government says, § 1101(g)'s conditions must be understood to operate sequentially.

As these grammatically and syntactically parallel examples indicate, § 1101(g)'s plain text alone doesn't resolve Romero's status. What, then, about statutory context? Another provision of the INA can—unhelpfully—be read to support either reading. In relevant part, that provision provides as follows:

20-12487                Opinion of the Court                13

> Any alien who has committed in the United States *at
> any time* a serious criminal offense . . . , for whom im-
> munity from criminal jurisdiction was exercised with
> respect to that offense, who *as a consequence of* the
> offense and exercise of immunity has departed from
> the United States, and who has not *subsequently* sub-
> mitted fully to the jurisdiction of the court in the
> United States having jurisdiction with respect to that
> offense, is inadmissible.

8 U.S.C. § 1182(a)(2)(E)(i)–(iv) (emphases added) (numbering omit-
ted). In support of the government's view, § 1182(a)(2)(E) indicates
that Congress knew how to add the qualifier "at any time" when it
wanted statutory conditions to operate independently of each
other. Because § 1101(g) contains no such qualifier, on the govern-
ment's theory, its conditions must be successive. But
§ 1182(a)(2)(E) could also be read to support Romero's position by
showing that Congress knew how to add the qualifiers "as a conse-
quence of" or "subsequently" to indicate dependence among stat-
utory conditions. Because § 1101(g) contains no such qualifiers, on
Romero's view, its conditions must be independent.

Each side can also claim the benefit of common sense—
which means, of course, that each side must also *contend* with
common sense. For its part, Romero's position tends to strain
logic. It would seem strange to say, for instance, that an alien was
"deported or removed in pursuance of law" when, at the time of
the alien's departure, there was no removal order and, therefore,

no "law" that the removal could have been "in pursuance of." Relatedly, it makes little sense for an alien to have "self-executed" a removal order that, at the time of her departure, didn't even exist. Reading § 1101(g)'s conditions as independent could also produce some strange practical consequences. Suppose, for example, that an illegal alien walked across the border from Mexico to Texas, then stepped back into Mexico for 10 seconds, and then crossed back over into Texas permanently. On an independent-conditions reading of § 1101(g), 20 years later, when an immigration judge orders the alien deported, his order would immediately dissolve as self-executed because the alien had momentarily "left the United States" two decades earlier.

The government's position, though, is not without its own difficulties. On its view, Romero would have been *rewarded* for illegally remaining in the United States longer in 1995. If she had voluntarily departed after the issuance of the 1995 order, the government would have had to seek its reinstatement to deport her now. But because she left earlier, the government gets to cut corners? It seems more than a little odd that an immigration-enforcement statute would incentivize an alien to extend her illegal stay in this country.

⋆  ⋆  ⋆

Taking account of § 1101(g)'s text and context, as well as common-sense considerations—none of which clearly specify whether the removal-order and departure conditions are independent or successive—we are constrained to conclude that we are

20-12487                Opinion of the Court                15

faced with a genuinely ambiguous statute.  Accordingly, we must next consider whether either or both of two tiebreakers—the rule of lenity and *Chevron*—apply to resolve the ambiguity.  As we will explain, both indicate that § 1101(g)'s conditions operate sequentially, not independently.[5]

B

We begin with lenity.  Our interpretation of § 1101(g)—a definitional provision—affects the scope of activity covered by one of the INA's criminal provisions, which imposes imprisonment, fines, or both on any alien who "has been . . . deported, or removed . . . and thereafter . . . enters, attempts to enter, or is at any time found in, the United States."  8 U.S.C. § 1326(a).  Criminal liability under § 1326(a) depends on whether an alien has been "deported . . . or removed," which, in turn, depends on how we interpret § 1101(g)'s definition of "deported or removed."

If we interpret § 1101(g) to embody two independent conditions, as Romero urges, an alien would be considered "deported or

---

[5] We acknowledge that two other courts have concluded that § 1101(g) unambiguously entails two independent conditions.  In *United States v. Ramirez-Carcamo*, the Fifth Circuit reasoned that the order in which § 1101(g)'s conditions occur doesn't matter because "the alien ultimately is outside the country with an enforceable order requiring that he have exited."  559 F.3d 384, 389 (5th Cir. 2009).  The court, though, offered little reasoning for that conclusion.  In *United States v. Sanchez*, the Seventh Circuit simply agreed—in dicta—with the Fifth Circuit's decision.  604 F.3d 356, 359 (7th Cir. 2010).  Because neither decision fully analyzed § 1101(g) and the ramifications of its different interpretations as we do here, we decline to follow them.

removed" if a removal order was *ever* issued against her and she *ever* left the United States, regardless of when the order was issued and when she left.  That reading, of course would subject more aliens to potential criminal liability under § 1326(a).  On the other hand, under the government's reading of § 1101(g), an alien would be considered "deported or removed" only if she left *after* a removal order was issued against her.  Thus, if we interpret § 1101(g)'s conditions to apply successively, fewer aliens will potentially be subject to criminal prosecution under § 1326(a).[6]

It is well-established that when we are faced with a statute that has both criminal and noncriminal applications, "we must interpret the statute consistently" in both contexts.  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  Moreover, and importantly here, whether we encounter such a statute "in a criminal or noncriminal context, the rule of lenity applies."  *Id.*; *see also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality op.) (applying the rule of lenity to a tax statute, in a civil setting, because the statute had criminal applications and had to be interpreted consistently across its applications); *id.* at 519, 523 (Scalia, J., concurring) (same).

---

[6] We note that the government's position here has a certain boomerang effect. In service of this one-off deportation, which could easily have been accomplished through a reinstated removal order, the government's position will seemingly *restrict* the number of viable criminal prosecutions under § 1326(a).

The rule of lenity is one of the oldest and most traditional tools of statutory interpretation. *See Johnson v. United States*, 576 U.S. 591, 613–14 (2015) (Thomas, J., concurring). The rule mandates that penal statutes be construed strictly: "[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *United States v. Bass*, 404 U.S. 336, 347 (1971) (quotation omitted). Accordingly, when Congress speaks in unclear or indefinite terms about what conduct is criminal, such that the governing statute is genuinely ambiguous, we construe that statute in favor of criminal defendants. *See Thompson/Center Arms Co.*, 504 U.S. at 517–18 (plurality op.). The rule of lenity's dual purposes are (1) to provide defendants with fair warning that their actions may trigger criminal consequences, and (2) to ensure that the legislature (and not the judiciary) remains responsible for criminalizing conduct. *See Bass*, 404 U.S. at 348.

An alien reading § 1101(g) and § 1326(a) in conjunction could reasonably conclude that because she voluntarily left the United States before she was ordered removed, she wasn't "deported or removed" within the meaning of § 1101(g) and, therefore, isn't committing any new crime under § 1326(a) by reentering the country. It would violate the fair-warning principles that underlie the rule of lenity for us to hold that, in fact, the alien *was* deported under § 1101(g) and, therefore, *did* commit a crime under § 1326(a) by reentering. Accordingly, we hold that the rule of

lenity requires that we accept the government's interpretation of § 1101(g), which criminalizes a narrower range of conduct under § 1326(a).

## C

Separately, the government asks us to defer to its interpretation of § 1101(g) under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, we must first determine whether, after employing the "traditional tools of statutory construction," we are "left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quotation omitted). If an unresolved statutory ambiguity persists, we must then defer to the relevant agency's interpretation, provided that it is reasonable. *Chevron*, 467 U.S. at 843.

Here, the government asks us to defer to a Department of Justice regulation titled "Self-removal," which states that "[a]ny alien who has departed from the United States *while* an order of deportation or removal is outstanding shall be considered to have been deported . . . or removed." 8 C.F.R. § 241.7 (emphasis added). Because the regulation specifies that an alien is "deported . . . or removed" only if she departs "while" a removal order is outstanding, the government reasons that Romero, who left *before* the issuance of the 1995 order, was not "deported or removed" within the meaning of § 1101(g).

In deciding whether to defer to DOJ's regulation, we begin by employing the "traditional tools" of statutory interpretation. As

we've explained, § 1101(g)'s text, related provisions, and common-sense considerations leave us with a genuinely ambiguous statute. We needn't decide here whether the rule of lenity breaks the tie and renders § 1101(g) unambiguous for *Chevron* purposes because lenity and the regulation both point in the same direction—both, that is, counsel a sequential, rather than independent, reading of § 1101(g). Accordingly, with respect to *Chevron*, the only question is whether the government's interpretation of § 1101(g) is "rational and consistent with the statute." *Sullivan v. Everhart*, 494 U.S. 83, 89 (1990) (quotation omitted). The regulation's interpretation of the statute—that an alien validly self-removes only when she leaves the United States "while" a deportation order is pending—is not the only reasonable reading, but it is *a* reasonable reading. Accordingly, the regulation is entitled to deference.

★　★　★

Whether we resolve § 1101(g)'s ambiguity through the principle of lenity or through *Chevron* deference, we reach the same conclusion: Section 1101(g)'s two conditions operate successively. Because Romero left the United States before she was ordered removed, she was not "deported or removed" within the meaning of § 1101(g). Accordingly, the government may lawfully deport her pursuant to the still-operative 1995 order.

**AFFIRMED**.