# FIFTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 5D2023-1997
LT Case No. 2022-CF-000555
_____

STATE OF FLORIDA,

    Appellant,

    v.

JEAN PAUL YANES-BLANCO,

    Appellee.

_____

On appeal from the Circuit Court for Hernando County.
Daniel B. Merritt, Jr., Judge.

Ashley Moody, Attorney General, Tallahassee, and Henry C.
Whitaker, Solicitor General, Jeffrey Paul Desousa, Chief Deputy
Solicitor and Robert Scott Schenck, Assistant Solicitor General,
Tallahassee, for Appellant.

Matthew J. Metz, Public Defender, and Victoria Rose Cordero,
Assistant Public Defender, Daytona Beach, for Appellee.


January 17, 2025


SOUD, J.

    The State of Florida appeals the trial court's dismissal of
twenty counts of human smuggling filed against Appellee Jean
Paul Yanes-Blanco. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla.

Const.; Fla. R. App. P. 9.030(b)(1)(A). We reverse and remand for further proceedings, concluding that the trial court erroneously interpreted the applicable Florida statute under which Yanes-Blanco was charged.

I.

The State alleges that on an afternoon in April 2022 Yanes-Blanco was stopped by the Florida Highway Patrol on Interstate 75 in Hernando County, Florida while driving a white Ford E350 cargo van. The van had a Texas license plate, illegally dark tint, and was "sagging" in the back from the weight of overloaded cargo.

When contacted by the patrolman, Yanes-Blanco did not have a driver's license issued by any state; rather, he provided only his Honduran passport as identification. During the encounter, the patrolman observed twenty passengers in the cargo area of the van, some of them sitting on top of others. These individuals had little to no luggage or money in their possession, and none of the twenty occupants in the cargo area had a driver's license issued by any state. Some of the occupants were wearing orange traffic vests given to them by Yanes-Blanco so as to appear as a work crew.

Given the totality of these circumstances, and because Yanes-Blanco was "sweating excessively" and the other individuals appeared "overtly nervous," everyone was ordered out of the van. Yanes-Blanco was found with $2,200 in cash on his person and a receipt from a Louisiana gas station printed at 2:51 a.m. earlier the same day. Further, the twenty occupants—each of whom was from Mexico or a Central American country—were found with numerous scratches on their extremities. Based on his training and experience while deployed with law enforcement at the United States southern border in Texas, the patrolman believed the individuals suffered the cuts while illegally crossing the southern border.

The occupants advised the Florida Highway Patrol that they had recently crossed the United States border into Texas via Mexico and stayed briefly at "stash houses" at various locations in Texas awaiting to be picked up by Yanes-Blanco and driven directly to the Orlando area (for which they paid money). Certain

2

of the occupants indicated they would be required to work for certain individuals in order to pay off their smugglers.

After law enforcement confirmed with U.S. Border Patrol that Yanes-Blanco and all occupants of the van were illegally in the United States, Yanes-Blanco was arrested and ultimately charged with twenty felony counts of human smuggling, in violation of section 787.07(1), Florida Statutes (2022), and one count of driving without a valid driver's license.

Yanes-Blanco filed a Florida Rule of Criminal Procedure 3.190(c)(4) motion to dismiss the human smuggling charges, arguing that his charged conduct fell outside that conduct prohibited by section 787.07(1). The State filed its traverse. Following a hearing, the trial court granted the motion and dismissed the charges.[1]

The State's appeal followed.

## II.

Rule 3.190(c)(4) allows a defendant to move to dismiss the charges filed against him when "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." In deciding a rule (c)(4) motion to dismiss, the trial court does not determine factual issues or weigh evidence. *See State v. Williamson*, 348 So. 3d 48, 51 (Fla. 5th DCA 2022).

Here, the trial court's granting of Yanes-Blanco's (c)(4) motion was based upon its interpretation of the statute under which Yanes-Blanco was charged. We review de novo a trial court's ruling on both a rule 3.190(c)(4) motion to dismiss and an issue of

---

[1] Though the trial court did not enter a written order granting the motion, the trial judge did articulate his reasoning. At the time Yanes-Blanco's case was pending before the trial court, two other cases, involving substantially the same charges and motions to dismiss, were also pending before the same trial judge. In stating his reasoning in dismissing Yanes-Blanco's case, the judge incorporated his reasoning expressed in the other case(s).

3

statutory interpretation. *See id.*; *see also State v. McKenzie*, 331 So. 3d 666, 670 (Fla. 2021).

A.

Many legal opinions have been written by Florida appellate courts, led by the Florida Supreme Court, regarding the indispensable work of Florida courts when we interpret Florida Statutes. It is prudent to recognize at the outset what the law requires—both as to the end of our endeavor and the means employed to faithfully discharge our duties.

When interpreting Florida Statutes, our responsibility "is to arrive at a 'fair reading' of the text by 'determining the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued.'" *Baldwin v. Lab'y Corp. of Am.*, 49 Fla. L. Weekly D1964 (Fla. 5th DCA Sept. 27, 2024) (quoting *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 947 (Fla. 2020)). Working toward this end "requires a methodical and consistent approach involving faithful reliance upon the natural or reasonable meanings of language and choosing always a meaning that the text will sensibly bear by the fair use of language." *Ham,* 308 So. 3d at 947 (internal quotation marks omitted).

Of course, the "starting point" in our work is always the plain meaning of the statute before us. *See Alachua County v. Watson*, 333 So. 3d 162, 169 (Fla. 2022). Florida courts follow the "supremacy-of-text principle," which instructs that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." *Ham*, 308 So. 3d at 946 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)). When the language of a statute is clear and unambiguous, "we need only resort to what Justice Thomas has described as the 'one, cardinal canon [of construction] before all others'—that is, we 'presume that a legislature says in a statute what it means and means in a statute what it says there.'" *Page v. Deutsche Bank Tr. Co. Am.*, 308 So. 3d 953, 958 (Fla. 2020) (alteration in original) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

Further, "[a] fundamental principle of statutory construction (and, indeed, of language itself) [is] that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Baldwin*, 49 Fla. L. Weekly D1964 (quoting *Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 324 (Fla. 2022)) (internal quotation marks omitted). As a result, "[c]ontext is a primary determinant of meaning." *Id.* In considering the context of a statute, we look to "the specific context in which that language is used, and the broader context of the statute as a whole." *See Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

B.

The statute under which Yanes-Blanco was charged provides, "A person who transports into this state an individual who the person knows, or should know, is illegally entering the United States from another country commits a felony of the third degree." § 787.07(1), Fla. Stat.[2] Yanes-Blanco filed his (c)(4) motion to dismiss arguing that the statute requires that he must be transporting one into Florida who is illegally entering the United States from another country. As a result, Yanes-Blanco argued since the twenty illegal aliens in the van he was driving entered the United States through the southern border—and their entry into the United States was then and there completed—his conduct does not fall within the purview of the statute because the statute "plainly intendeds [sic] to punish the active smuggling of persons into the United States via the borders of Florida." Even if the statute could be read to prohibit his conduct, Yanes-Blanco suggests that the rule of lenity required dismissal of the twenty human smuggling charges. The State rejected Yanes-Blanco's

---

[2] After the events giving rise to the charges against Yanes-Blanco, section 787.07(1) was amended. The statute now provides in pertinent part, "[A] person who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country commits a felony of the third degree."

5

interpretation of the statute, instead arguing that "is illegally entering" plainly contemplates the continuous act of entering the United States until the illegal alien is delivered by the smuggler to his final destination in the interior. As a result, the State asserted, Yanes-Blanco's conduct fell within the statute.

The trial court granted Yanes-Blanco's motion to dismiss. In reaching its decision, the trial court interpreted the phrase "is illegally entering" as being limited to illegal aliens who enter the United States through Florida's state borders. The court further determined that an illegal alien's act of illegally entering the country is accomplished and completed at a singular, identifiable moment in time—when an illegal alien physically crosses the border into the United States (akin to when an individual enters a house upon crossing the threshold of a door). As a result, the trial court concluded that after the moment when entry had been completed by an illegal alien, Yanes-Blanco's conduct in transporting the aliens to the Orlando area fell outside the statute under which he was charged.

The trial court's analysis is contrary to the plain language of the statute when properly understood in its context.

1.

Importantly, the focus of section 787.07(1) is the conduct of the smuggler, not the illegal alien, in that it criminalizes the smuggler's transporting "into this state an individual who the person knows, or should know, is illegally entering the United States from another country." § 787.07(1), Fla. Stat. And the act of smuggling continues until the human smuggler ceases transportation and parts ways with the illegal alien, usually at the alien's intended destination. *See United States v. Lopez*, 484 F.3d 1186, 1192–93 (9th Cir. 2007) (providing that transportation of an illegal alien "continues during the duration of the act of transportation."); *see also Human Smuggling & Trafficking Ctr., Dep't of Homeland Sec., Human Trafficking vs. Human Smuggling* at 4 (2016), https://tinyurl.com/yck2f9fb.

In his motion to dismiss, Yanes-Blanco placed considerable emphasis on the phrase "is illegally entering." Yet his reading of that phrase, adopted by the trial court, is strained and unduly

limits all that the language may be fairly read to mean. *See* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 23 (legal text "should be construed reasonably, to contain all that it fairly means.").

To "enter" means "to come or go in; make an entry." *Enter*, AMERICAN HERITAGE DICTIONARY (5th ed. 2011). The State correctly argues that the statute's phrase "is illegally entering" is in the present progressive tense, which indicates a continuing action or course of conduct. *See United States v. Balint*, 201 F.3d 928, 933 (7th Cir. 2000) (citing Robert Perrin, *The Beacon Handbook* 146–47 (4th ed. 1997)); *see also* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 137 (2016) ("The progressive tenses, also known as *continuous tenses*, show action that progresses or continues."). And the Florida Legislature's "use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). Florida courts have long presumed that the Legislature knows the meaning of words and the rules of grammar when writing our laws. *Fla. State Racing Comm'n v. Bourquardez*, 42 So. 2d 87, 88 (Fla. 1949).

Here, in interpreting "is illegally entering", the context in which the phrase is used further informs our decision. In the context of illegal immigration into the United States, and as more fully discussed in Judge Boatwright's well-reasoned concurrence, federal courts have recognized that—rather than a singular event occurring at an instantaneous, identifiable moment in time—an illegal alien's entry into the United States is a continuous process. *See, e.g., Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (holding that an illegal alien who is detained shortly after crossing the border "cannot be said to have 'effected an entry.'" (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001))).

This principle extends equally to the case before us. The illegal aliens in Yanes-Blanco's van crossed the southern border of the United States of America. And while that crossing began the process of illegally entering the country, it did not *conclude* their entry into the country. *Adrianza v. Trump*, 505 F. Supp. 3d 164, 178–79 (E.D.N.Y. 2020), *opinion vacated, appeal dismissed sub nom. Adrianza v. Biden*, No. 20–4165, 2021 WL 10140434 (2d Cir.

Oct. 13, 2021) (interpreting "alien . . . who is arriving on land" to indicate a process that continues after an illegal alien crosses the border of the United States); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1012 (9th Cir. 2000). Their entry continued until they arrived at their destination, Orlando, Florida. And because the twenty illegal aliens in Yanes-Blanco's van continued illegally entering the United States when driving from Texas to Florida (seemingly directly, considering the gas receipt from Louisiana earlier that same day), Yanes-Blanco's alleged conduct falls within section 787.07(1) and was sufficient to establish a prima facie case of human smuggling.

2.

Finally, we reject the notion that the rule of lenity requires dismissal of the human smuggling charges filed against Yanes-Blanco. While the rule of lenity finds its origins in common law as a canon of construction, "the Legislature has elevated lenity . . . to a statutory command." *See Conage*, 346 So. 3d at 602. As governing this case, if section 787.07(1) "is susceptible of differing constructions, it shall be construed most favorably to" Yanes-Blanco. *See* § 775.021(1), Fla. Stat. However, the rule of lenity comes into play only "at the end of the interpretive process" and only if section 787.07(1) remains ambiguous after the Court has employed traditional canons of construction. *See Conage*, 346 So. 3d at 603 (citing *Paul v. State*, 129 So. 3d 1058, 1064 (Fla. 2013)).

Here, consulting reliable and traditional canons of construction has resolved the disputed interpretation of the subject statute. And having answered "the interpretive question put to us, our 'sole function' is to apply the law as we find it." *Alachua County*, 333 So. 3d at 169 (quoting *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021)). As a result, we have no need or occasion to resort to lenity.

III.

Accordingly, as the facts alleged in the charging information and otherwise presented in the record before us establish a prima facie case, we REVERSE and REMAND for further proceedings consistent with this opinion.

It is so ordered.

BOATWRIGHT, J., concurs, with opinion.
WALLIS, J., concurs in result only.

—————————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

—————————————————

BOATWRIGHT, J., concurring opinion.

I

I agree with the majority opinion that a reversal is warranted because in the context of illegal immigration, illegally entering the United States is not an instantaneous event but is rather continuous in nature. In considering this in relation to smuggling, I agree with Judge Soud that the conduct at issue is continuous and does not end until the smuggler reaches his destination. I write separately to discuss that, based on Federal case law, illegal entry into the United States is treated as a continuous process rather than a single moment in time; and in the context of smuggling, the process does not end until the smuggler has reached his/her destination.

A.

This case, as the majority has correctly stated, is based solely on the interpretation of section 787.07, Florida Statutes (2021). The issue revolves around the meaning of the words, "is illegally entering the United States," as used in the statute. Particularly, the dispute is over whether an illegal alien is considered to have entered the United States at the time when he crosses the border, or whether the term "is illegally entering the United States" applies to a continuous process that ends sometime after crossing the border.

The trial court found that the statute criminalizes the conduct of one who is actively smuggling individuals into the state while the individuals are illegally entering the United States. According to the trial court, this would have to be contemporaneous action. Based on this reading, the trial court reasoned that once the individuals at issue crossed the border from Mexico into Texas, they were no longer "entering," but had "entered," the United

States. Under this reading, the act of entering the United States would have been completed when the individuals at issue entered the United States from Mexico via the Texas border, as this is where the instantaneous act of "entry" occurred. Applying that construction to the facts in this case, once Yanes-Blanco picked up the individuals in Texas and drove them into Florida, their act of entering the United States had already ceased, and his conduct thus fell outside the parameters of the statute. As a further observation, under the trial court's interpretation of the statute, the individuals Yanes-Blanco was smuggling would have been required to come directly by boat or plane from another country and cross into the United States via Florida, as this is the only way they could have contemporaneously entered both the United States and Florida.

The focus of the trial court was on the phrase, "is entering the United States." The trial court likened this action to one entering a house: once one enters his/her house through the front door, they are no longer entering, but have entered (and the act of entering is completed). However, as the State pointed out, the common usage of the verb "entering" can differ, as it can have the connotation of either a single entrance or a longer means of access. *See* Bryan A. Garner, *Garner's Modern English Usage* 333 (4th Ed. 2016). Further, the State urged to the trial court to base its interpretation on the precise statutory language used, which "is *illegally* entering the United States," rather than "entering the United States." In this regard, the State argued below—as it argues on appeal—that in the context of illegal immigration, based on federal law, "illegally entering the United States" is a continuous process, rather than an instantaneous event.

The trial court acknowledged that the meaning of the statute was not clear based on the State's argument, as it indicated its decision was a close call. As such, the trial court decided it was necessary to interpret the statute based on other statutory tools of interpretation rather than relying solely on the plain language and

11

grammatical rules. However, instead of interpreting the statute based on the relevant federal law as the State proposed, the trial court interpreted the statute in light of legislative history, an American Civil Liberties Union report, and news articles containing interviews with Florida legislators. As this court has been particularly hesitant to rely on legislative history[1] to interpret statutory language, I believe the trial court failed to take into account the settled legal concept of "illegally entering the United States" as defined by the federal case law provided by the State. It is impossible to fully and properly analyze the phrase, "is illegally entering the United States," without recognizing that the term is a federal concept.

"In adhering to the interpretation by the Florida courts of the applicable law in this state, we are mindful of the rule that state courts, in construing and interpreting state law, are not bound by the decisions of federal courts." *Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, AFL-CIO v. Blount Int'l, Ltd.* 519 So. 2d 1009, 1012 (Fla. 2d DCA 1987). State courts are "bound . . . to apply the provisions of the Constitution of the United States and the lawful Acts of Congress," but they "are not bound by any federal court regarding the interpretation of state law and only by the United State[s] Supreme Court in regard to interpretations of the United States Constitution and Acts of Congress." *Id.* Though "Florida courts often look to federal decisions as a guide to interpreting state statutes" when dealing with similar federal laws, *Martinolich v. Golden Leaf Mmt., Inc.* 786 So. 2d 613, 615 (Fla. 3d DCA 2001), any reliance on this authority is merely persuasive. *Bawtinhimer v. D.R. Horton, Inc.,* 161 So. 3d 539, 540 (5th DCA 2014); *see also Cimino v. Am. Airlines, Inc.* 183 So. 3d

---

[1] Generally, this Court has questioned the reliability of the use of legislative history in interpreting statutes and has eschewed its use so as to avoid the "backwards approach to statutory construction." *See Taylor v. Nicholson-Williams, Inc.,* 368 So. 3d 1007, 1015 n.3 (Fla. 5th DCA 2023).

1242, 1243 (Fla. 4th DCA 2016) (holding that the interpretation of Title VII by a federal court is merely persuasive authority for Florida courts interpreting a Florida statute).

In relation to the regulation of immigration, it has been firmly established that Congress has the plenary power to make policies and rules pertaining to the exclusion of aliens. *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972). The Supreme Court has recognized that "[t]he admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). In this regard, "the power to admit or exclude aliens is a sovereign prerogative." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2021) (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). "The government's interest in efficient administration of the immigration laws at the border . . . is weighty." *Landon*, 459 U.S. at 34. "Further, it must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Id.* (citations omitted).

According to the United States Supreme Court, the definition of 'entry' as applied for various purposes in federal immigration law has evolved judicially. *Rosenberg v. Fleuti,* 374 U.S. 449, 453 (1963). Federal courts have acknowledged that the definition of entry as developed through the common law can have a more narrow and technical meaning than its colloquial usage. *Tellez v. Lynch*, 839 F.3d 1175, 1178 (9th Cir. 2016). Some see the definition of entry in this context as a type of legal fiction. *United States v. Parga-Rosas*, 238 F. 3d 1209, 1213 (9th Cir. 2001) (while interpreting 8 U.S.C. § 1326, holding that even though an individual is present in the United States, entry is not accomplished until a person is free from official restraint); *see also United States v. Pecheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000) (finding that term "enter," in relation to federal immigration law, means more than just crossing the United States border).

13

In this context, the United States Supreme Court has held that just because an individual has crossed the border illegally does not mean he has "effected an entry" into the United States. *Thuraissigiam*, 591 U.S. at 140. The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. *Id.*; *see also Kaplan v. Tod,* 267 U.S. 228, 230 (1925) (despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Leng May Ma v. Barber,* 357 U.S. 185, 188–90 (1958) (detention of an alien in custody pending determination of admissibility does not legally constitute an entry even though the alien is physically within the United States).

By way of example, in a habeas corpus proceeding, the United States Supreme Court found that an illegal alien was not entitled to due process rights because he had not effected an entry into the United States even though he had crossed the border. *Thuraissigiam*, 591 U.S. at 140. The Court opined that even though the individual had made it 25 yards across the border, he was treated as if he had not entered the country. *Id.* at 139–40. The reason for this is that an alien who tries to enter the country illegally is treated as an "applicant for admission," and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry." *Id.* (citing *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). Like an alien detained after arriving at a port of entry, an alien who illegally bypasses the port of entry is "on the threshold." *Thuraissigiam*, 591 U.S. at 140 (citing *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

This principle that an illegal entry into the United States does not occur simply by crossing the border has arisen where federal courts have interpreted the phrase "arriving on land," as codified in 8 U.S.C. § 1225(b)(2)(C). *Adrianza v. Trump*, 505 F. Supp. 3d 164, 169 (E.D.N.Y. 2020). In *Adrianza v. Trump*, the Department of Homeland Security ("DHS") had announced Migrant Protection Protocols, which provided that certain migrants who arrive into

14

the United States on land without proper documentation may be returned to Mexico for the duration of their immigration proceedings. *Id.* at 170. The plaintiff migrants sued to have such return orders rescinded, contending that they were not "arriving on land" when apprehended, as they already "walk[ed] for a long time" after illegally crossing the U.S.–Mexico border on foot. *Id.* In essence, the migrants argued that when they crossed into the United States, they had already "arrived."

However, the court decided differently, relying on the statute at issue, which provided:

> In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.
>
> 8 U.S.C. § 1225(b)(2)(c).

*Id.* at 169–70. The court noted that the migrants' argument turned on the definition of "arriving," which means to "come to the end of a journey" or to "reach a destination." *Id.* at 178–79. According to the court, "Congress's 'use of the present progressive tense "arriving," rather than the past tense "arrived," implies [a] geographic or temporal limit.'" *Id.* at 178 (quoting *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 23 (B.I.A. 2020)). "But that present progressive formulation—"is arriving on land," 8 U.S.C. § 1225(b)(2)(C)—also suggests '"an ongoing process,"' rather than an instantaneous event." *Id.* at 178 (*M-D-C-V*, 28 I. & N at 22)).

Taking the term and tense together, the court concluded that aliens are not "arriving on land" only at the moment of crossing the border. According to the court, migrants are not naturally said to have "come to the end of [their] journey" as they continue making an arduous journey on foot through a border zone. Instead, aliens who have recently crossed the boundary line and are

15

walking toward the interior of the country are still in the process of "arriving on land" from a foreign territory. *Id.; see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1012 (9th Cir. 2000) ("'Arrival' in this context should not be considered ephemeral or instantaneous but, consistent with common usage, as a process rather than a singular moment in time. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien' for the various purposes in which that term is used in the newly revised provisions of the INA.").

Building on this concept, federal courts, in other contexts, have treated illegal entry into the United States as a continuous process rather than an isolated moment in time. Per 8 U.S.C. § 1357(a)(2), federal immigration officers have the power to make warrantless arrests of aliens when aliens are "entering or attempting to enter the United States in violation of law" in the "presence or view" of the officer. Like Florida's law at issue, the federal statute uses the present progressive tense to describe the act of entering the country. However, rather than requiring the officer to witness or apprehend the illegal alien at the exact moment he crosses the border, federal courts have allowed warrantless arrests under this provision within 200 or 300 miles of the border, even though the officers did not actually view the individuals illegally cross the border. *United States v. Orozoco*, 191 F.3d 578 (5th Cir. 1999). Thus, it follows, that federal case law does not conceptualize the act of entering the country illegally as one that only occurs at the border, but rather as one that occurs as part of a continual process. *See also Torres-Navarro v. Barr*, 756 F. App'x 772, 772–73 (9th Cir. 2019) (individual found miles inside the U.S. was still "entering" for purposes of warrantless arrest per 8 U.S.C. § 1357(a)(2)).

Closely related to Yanes-Blanco's case, 8 U.S.C § 1324, entitled "Bringing in and Harboring Certain Aliens," makes it a crime for "[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization

16

to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien." At least one federal appellate court has applied this to a defendant's conduct where he met two illegal aliens in the United States within a few yards of the border shortly after they had walked across it and then transported them within the United States. *United States v. Aslam*, 936 F.2d 751, 753 (2d Cir. 1991). Even though the aliens had already crossed the border and the defendant did not bring them into the country, the court found that the defendant's conduct fell within the statutory language. *Id.* at 755. The court reasoned that that section 1324(a)(2) punishes those who participate in the process of bringing illegal aliens into the United States, and that the offense does not end at the instant the alien sets foot across the border. *Id.* The court further stated that "[t]he illegal importation of aliens, like the illegal importation of drugs, . . . continues at least until the alien reaches his immediate destination in this country." *Id.* (citing *United States v. Leal,* 831 F.2d 7, 9 (1st Cir. 1987); *United States v. MacDougall,* 790 F.2d 1135, 1150–51, 1153 (4th Cir. 1986); *Compare United States v. Merkt,* 794 F.2d 950, 953 (5th Cir. 1986) ("applying former section 1324(a)(1) to defendant who met aliens on United States side of Mexican border and brought them to a sanctuary")), *with United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (holding that the crime of "bring[ing]" unauthorized alien "to" United States is continuing offense that terminates, thereby foreclosing aiding and abetting liability based solely on subsequent acts, when initial transporter drops off alien at location inside United States, not earlier at moment border is crossed, nor later when intended or ultimate destination is reached).

I agree with the majority that the trial court's granting of Yanes-Blanco's motion to dismiss should be reversed. Yanes-Blanco's argument was based solely on the fact that the illegal aliens he was transporting had completed the act of entering the United States when they crossed the Texas border, and thus were

no longer entering the United States. The trial court predicated its decision on this same proposition, and this is the argument Yanes-Blanco makes on appeal. However, the aforementioned federal court decisions in numerous situations that are analogous to this case have reached the opposite conclusion—i.e., illegal entry into the United States is not an isolated event which occurs only at the instant the illegal alien crosses the border, but rather has been repeatedly construed as a continuous process.

There is no dispute that the 20 individuals Yanes-Blanco was transporting were unlawfully in the United States, and there is no question he had been transporting them in a continuous manner from the time they entered the United States until they were ultimately apprehended in Florida. Thus, the only remaining question was whether the transported individuals had entered the country when they crossed the border or whether they were still in the process of entering the United States when being transported by Yanes-Blanco. I find the federal courts' decisions on this matter persuasive in that illegal entry into the United States does not always take place at the time the illegal alien crosses the border, but rather can take place at a later time as part of a continual process as the alien is moving through the interior of the United States. As a result, I agree with the majority opinion that, at a minimum, the State made out a prima facia case for the crime of human smuggling.

B.

Further, the focus of section 787.08 is on the smuggler (and the act of smuggling), as Judge Soud has aptly stated, even though the trial court and Yanes Blanco singularly focused on the definition of the word word "entering." The title of the statute confirms this conclusion. Statutory titles can be used in determining the meaning of a statute. *State v. Demons,* 351 So. 3d 10, 16 (Fla. 4th DCA 2022) (holding that the courts can look to the "title-and-headings" canon for guidance in resolving an ambiguity in the legislation's text); *see also Fla. Dep't of Rev. v. Piccadilly*

18

*Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (while the title "cannot substitute for the operative text of the statute," the title can help resolve any "doubt about the meaning of a statute").

Section 787.07 is entitled "Human smuggling." The term "smuggling," like "entering," is also in the progressive tense and connotes a continuous or ongoing process. This can be ascertained from the definition of smuggling, which is "the act or process of taking things or people to or from a place secretly and often illegally. "Smuggling," Cambridge Dictionary online, https://dictionary.cambridge.org/us/dictionary/english/smuggling (last visited Dec. 26, 2024). In regard to smuggling illegal aliens, federal courts have interpreted this to be an ongoing process which encompasses any clandestine movement or concealment of aliens, irrespective of whether a border crossing is involved. *United States v. Martinez-Candejas*, 347 F.3d 853, 855–56 (10th Cir. 2003). As a result, federal courts in addressing smuggling crimes have focused on the intended destination for a smuggled person or drugs, as the crime is not complete until the smuggler reaches the destination of delivery. *Aslam*, 936 F. 2d at 755; *Leal*, 831 F.2d at 9–10; *United States v. Corbin*, 734 F.2d 643, 652 (11th Cir. 1984) (holding drug "[i]mportation is a 'continuous crime' that is not complete until the controlled substance reaches its final destination point").

Thus, the majority is correct that smuggling is an ongoing process and that the smuggler's conduct ends when he reaches his destination. This is supported by both the statutory language and the federal persuasive authority. Defense counsel below appeared to concede this point by acknowledging that if Yanes-Blanco had driven the illegal aliens from Mexico to Florida, he would be in violation of the statute. Therefore, Yanes-Blanco's conduct, as alleged by the State, fell within the confines of section 787.07 since he had not yet reached his ultimate destination of the Orlando area with the illegal aliens when he was apprehended.

## II.

In discussing the impact that federal law has on this issue, it is difficult to overlook the fact that the Eleventh Circuit has found on two different occasions that provisions closely related to the statutory provision at issue in this case have been preempted by federal law under the principle of conflict preemption. *See Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*, 691 F.3d 1250, 1265–67 (11th Cir. 2012), and *United States v. Alabama*, 691 F.3d 1269, 1285–88 (11th Cir. 2012). In addition, on May 10, 2023, Governor DeSantis signed into law Senate Bill 1718 ("SB 1718"), which amended section 787.07; and the Southern District of Florida recently found that the newly enacted version of section 787.07 is preempted by federal law in *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311 (S. D. Fla. 2024). These issues were not argued below, but they were addressed in the State's initial brief; and because the issue of whether section 787.07 is preempted by federal law was not properly preserved below, I agree with the majority opinion's approach not to address this matter.

## III.

Since it is clear from federal law that the act of illegally entering the United States does not end once an individual crosses the border in every case, and that smuggling is an ongoing process that is not completed until the smuggler reaches his or her destination, I agree that the State has made out a prima facia case for a violation of section 787.07 and that reversal is appropriate in this case.

Finally, the trial court had concern about guidance for the jury on this issue should the case proceed to a jury trial, since there are no standard jury instructions regarding this statute. However, as the State argued below, it planned on providing expert testimony on this issue. This would be appropriate, as Florida courts have routinely allowed expert testimony to clarify and guide on issues of federal immigration law. *See Lisboa v. Dade Cnty. Prop.*

*Appraiser*, 705 So. 2d 704, 706 (Fla. 3d DCA 1998) (finding that the use of expert testimony from an immigration law expert was appropriate in determining whether an individual was a "permanent resident" for purposes of Florida's homestead exemption from ad valorem taxation); *see also Fla. Bar v. Whitney*, 132 So. 3d 1095 (Fla. 2013) (referencing that the use expert testimony regarding immigration law was helpful to the referee in forming his decision). Further, the majority opinion has aptly provided the law on this issue that should provide proper guidance and obviate the trial court's concern about how to appropriately instruct the jury.